**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

TAMARA FONG, *as the Administratix and Administratix Ad Prosequendum of the ESTATE OF CARL DORSEY III, and Guardian Ad Litem to Minor Children G.O.D., J.D.D., and J.H.D.*,

Plaintiff,

v.

CITY OF NEWARK, *et al.*,

Defendants.

Civil Action No. 22-7243 (SDW) (ADS)

MARILYN WAGNER, *on behalf of Minor Child B.D.*,

Plaintiff,

v.

CITY OF NEWARK, *et al.*,

Defendants.

Civil Action No. 23-731 (SDW) (ADS)

**OPINION**
October 20, 2026

**WIGENTON**, District Judge.

Before this Court is Defendant Rod Simpkins's ("Defendant" or "Simpkins") Motion for Summary Judgment (D.E. 222 ("Motion")) pursuant to Federal Rule of Civil Procedure ("Rule") 56.[1] Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and § 1367(a). Venue is proper pursuant

[1] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System under Docket Number 22-7243 and any internal citations contained therein, unless otherwise indicated.

to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons stated herein, the Motion is **DENIED**.

## I. FACTUAL BACKGROUND[2]

Although much is disputed when it comes to the facts and circumstances leading up to the events that unfolded on New Year's Day in 2021, one fact is indisputable: Defendant Simpkins shot Carl Dorsey (hereinafter, "Dorsey" or "Decedent"). This Court describes the undisputed facts captured by a nearby residence's camera.[3]

While on patrol on New Year's Day, at approximately 12:04 a.m., Newark Police Department Detectives Rod Simpkins, Ricardo Reillo, and Carlos Alvarado were traveling eastbound on Avon Avenue in Newark, New Jersey toward South 11th Street in an unmarked Chevrolet Trailblazer driven by Detective Alvarado. (Def.'s SOMF ¶ 2; *Fong* SAC ¶¶ 29–31.) Simpkins was in the rear right passenger-side seat of the Chevrolet Trailblazer. (Def.'s SOMF ¶ 3; *Fong* SAC ¶ 30.) Detective Alvarado turned left onto South 11th Street, which is a one-way street, and stopped across from 693 South 11th Street. (Def.'s SOMF ¶¶ 6, 23.) As the detectives approached 693 South 11th Street, they did not have the lights and sirens on. (Def. RSODMF ¶

[2] This Court recites only the facts necessary to contextualize the present Motion. The facts are derived from Defendant Simpkins's Statement of Undisputed Material Facts (D.E. 222-19 ("Def.'s SOMF")), Plaintiffs' Statement of Disputed Material Facts (D.E. 228-1 ("Pls.' SODMF")), Defendant Simpkins's Response to Plaintiffs' Statement of Disputed Material Facts (D.E. 230-1 ("Def. RSODMF")), and the Second Amended Complaint in *Fong* (Dkt. No. 22-7243, D.E. 164 ("*Fong* SAC")). Disputed facts will be indicated as such.

[3] Although Federal Rule of Civil Procedure 56 requires that this Court "construe the record in the light most favorable to the nonmoving party," this Court will not draw inferences that are inconsistent with the video footage of the incidents. *Ference v. Township of Hamilton*, 538 F. Supp. 2d 785, 789, 797 (D.N.J. 2008); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (indicating that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" and stating the Court of Appeals should not have relied on the respondent's version of facts, but should "have viewed the facts in the light depicted by the videotape").

32.) The door camera for the home located at 693 South 11th Street captured Dorsey's shooting. (*Id.* ¶ 24.)

The video depicts how Simpkins exited the rear right-side of the vehicle and walked towards the front of the vehicle. (D.E. 222, Def. Ex. 3 at 00:14–0:18.) At the same time, Dorsey, who is several feet in front of the Trailblazer, can be seen emerging on the lower left side of the screen as he crosses the street by walking diagonally towards the Trailblazer. (*Id.* at 00:16–18.) Dorsey did not know Detective Simpkins was a police officer. (Def. RSODMF ¶ 32.) Dorsey and Simpkins bumped into each other and as Simpkins fell to the ground, he shot Dorsey, who appears to fall in between the two vehicles parked on the street. (*Id.* at 00:18–20.) These events unfolded in a matter of seconds; Dorsey was shot at approximately 12:05 a.m. (Def.'s SOMF ¶ 65.) After Dorsey was shot, he laid on the sidewalk while Simpkins and other law enforcement officers searched his person and the surrounding area. (Def.'s SOMF ¶¶ 67–70, 73; *Fong* SAC ¶ 70.) It is undisputed that Dorsey was unarmed. (Def.'s SOMF ¶ 71; *Fong* SAC ¶ 18.)

As discussed below, there are a host of genuine disputes regarding not just the incident, but the events preceding it, such that it would be inappropriate for this Court to resolve this case on summary judgment; a jury should have the opportunity to weigh the evidence before it, make factual determinations, and ultimately decide the question of Simpkins's liability.

## II. PROCEDURAL HISTORY

### *A. Fong v. City of Newark*

Plaintiff Tamara Fong ("Fong") is the administratrix and co-administratrix *ad prosequendum* of Carl Dorsey's estate and the natural guardian and guardian *ad litem* of minor children G.O.D., J.D.D., and J.H.D. (*Fong* SAC at 1.) Fong initiated this lawsuit on December

13, 2022. (D.E. 1.) Following extensive motion practice[4] and discovery, and relevant to this Motion, the operative pleading at this juncture is the Second Amended Complaint, which alleges the following claims pursuant to 42 U.S.C. § 1983: excessive use of force (Count I), unlawful seizure (Count II), unconstitutional search (Count III), and failure to administer medical aid (Count IV).[5] (*Fong* SAC at 27–30.) Fong also asserts a claim against Simpkins for violation of the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. §§ 10:6-2 *et seq.* (Count VII). (*Id.* at 34.)

***B. Wagner v. City of Newark***

Marilyn Wagner ("Wagner") is the co-administratrix *ad prosequendum* of Carl Dorsey's estate and the mother and natural guardian of minor child B.D. (Dkt. No. 23-731, D.E. 88 ("Wagner SAC") ¶ 2.) Wagner initiated her lawsuit in state court and Defendant, City of Newark removed the matter to this Court on February 8, 2023. (Dkt. No. 23-731, D.E. 1.) As with *Fong*, the matter went through extensive motion practice and discovery.[6]

At this point, Wagner's Second Amended Complaint is the operative pleading.[7] (Dkt. No. 23-731, D.E. 88.) Wagner asserts the following claims pursuant to 42 U.S.C. § 1983: excessive force (Count I), unlawful seizure (Count II), unlawful search (Count III), and failure to administer medical aid (Count IV). (Wagner SAC at 23–28.) Wagner also asserts the following state law

[4] Throughout the pendency of this litigation this Court has addressed multiple motions to dismiss Fong's complaints. (D.E. 79, 162, 212.)

[5] Plaintiff Fong indicates she does not intend to move forward on Counts III and IV at trial. (D.E. 228 at 9–10.) Thus, this Court dismisses Counts III and IV of Fong's Second Amended Complaint. *See Shaporov v. Levine*, No. 22-1150, 2025 WL 2731460, at *6 (D.N.J. Sept. 25, 2025) ("A plaintiff's 'failure to respond to [a] defendant's arguments on summary judgment constitutes an abandonment of these causes of action.'" (alteration in original) (quoting *Greene v. Elizabeth Police Dep't*, No. 18-8972, 2023 WL 6233124, at *5 (D.N.J. Sept. 26, 2023))).

[6] This Court also addressed several motions to dismiss Wagner's complaints. (D.E. 56, 84, 118.)

[7] In Plaintiffs' Opposition Brief, Wagner states Counts III, IV, and VII "will not be the subject of further briefing," or pursued at trial. (D.E. 228 at 40.) Given said statement, this Court dismisses Counts III, IV, and VII of Wagner's Second Amended Complaint. *See Shaporov*, 2025 WL 2731460, at *6.

claims: excessive force in violation of the NJCRA (Count VI); a due process violation claim pursuant to the New Jersey Constitution (Count VII); assault (Count IX); battery (Count X); intentional infliction of emotional distress ("IIED") (Count XI); negligent infliction of emotional distress ("NIED") (Count XII); wrongful death pursuant to the New Jersey Wrongful Death Act, N.J. Stat. Ann. §§ 2A:31-1 *et seq.* (Count XIV); and a survival claim under the New Jersey Survival Act, N.J. Stat. Ann. § 2A:15-3 *et seq.* (Count XV). (Wagner SAC at 32–35, 37–40, 42–44.)

### C. Motion for Summary Judgment[8]

On March 28, 2026, Defendant Simpkins moved for summary judgment. (D.E. 222.) Consistent with Judge Hammer's January 29, 2026 text order, Plaintiffs jointly opposed Simpkins's Motion. (D.E. 228.) Simpkins filed his reply on May 5, 2026. (D.E. 230.)

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A dispute is not genuine if it merely involves "some metaphysical

---

[8] Pertinent to this Motion, both cases were consolidated on June 9, 2023. (Dkt. No. 22-7243, D.E. 50; Dkt. No. 23-731, D.E. 21.) On January 29, 2026, Magistrate Judge Hammer (ret.) ("Judge Hammer") issued a text order setting forth a briefing schedule and directing the parties to collectively file their moving and opposition briefs given the substantial overlap in both the factual background and legal issues across the matters. (Dkt. No. 22-7243, D.E. 217; Dkt. No. 23-731, D.E. 120.)

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Central Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). Although courts view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, the nonmoving party cannot simply rely on the "mere allegations or denials of his pleadings." *Id.* at 288. Similarly, "[b]are assertions, conclusory allegations, or suspicions will not suffice." *Id.* at 288–89 (quoting *Central Dauphin*, 765 F.3d at 268–69). If the nonmoving party fails to make an adequate showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## IV. DISCUSSION

### A. Qualified Immunity

"Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution."[9] *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). However, the doctrine of qualified immunity maintains that "government officials performing discretionary functions

[9] 42 U.S.C. § 1983 provides, in relevant part: "Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."

generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). To determine whether a police officer is entitled to the qualified immunity defense, a court considers "(1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)). Because qualified immunity operates as an immunity from suit rather than a mere defense to liability, it is the officer's burden to establish that he or she is entitled to such immunity. *Pearson*, 555 U.S. 223, 231 (2009); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001). Courts have discretion to address the steps in either order. *Pearson*, 555 U.S. at 236. Notably, "[a]lthough qualified immunity is a question of law determined by [courts], when qualified immunity depends on disputed issues of fact, those issues must be determined by [a] jury." *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006).

Although absent from the text of § 1983, the doctrine of qualified immunity "acts to safeguard government, and thereby to protect the public at large, not to benefit its agents." *Wyatt*, 504 U.S. 168. The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably," and it "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a

mistake based on mixed questions of law and fact." *Conde v. City of Atlantic City*, 293 F. Supp. 3d 493, 500 (D.N.J. 2017) (quoting *Pearson*, 555 U.S. at 236).

Here, Plaintiffs assert violations of Dorsey's Fourth Amendment rights and there is no dispute that Simpkins was acting under color of law. Yet Simpkins argues he is entitled to qualified immunity on Plaintiffs' excessive force and unlawful seizure claims because he acted as a reasonable officer would have and because there is no clearly established law that would have precluded him from using deadly force to defend himself against an individual who "while running from an active shooting scene" used sufficient force to knock him down. (D.E. 222-2 ("Mov. Br.") at 36–42.) Plaintiffs argue Simpkins cannot make the requisite showing for either prong of the qualified immunity analysis. Regarding the first prong, Plaintiffs argue that the factfinder must determine whether his use of force was reasonable and alternatively submit that Simpkins acted unreasonably. (D.E. 228 ("Opp'n Br.") at 15, 30, 34–37.) As to the second prong, Plaintiffs maintain Dorsey's right was clearly established under *Tennessee v. Garner*, 471 U.S. 1 (1985). (*Id.* at 22–28.)

This Court turns to consider whether the facts, taken in the light most favorable to Plaintiffs, show that Simpkins's conduct violated a constitutional right and whether that right was clearly established. *See Saucier*, 533 U.S. at 201.

**i. Violation of a Constitutional Right**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *Lamont*, 637 F.3d at 182–83. Here, it is indisputable that Simpkins seized Dorsey when he shot and killed him. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985)

("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."); *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (applying *Garner* to find that the fleeing suspect, Abraham, "obviously was 'seized' when shot"). The pivotal question is whether Simpkins's use of deadly force was reasonable.

"It is unreasonable for an officer to use deadly force against a suspect unless the officer has good reason, 'to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Lamont*, 637 U.S. at 183 (quoting *Garner*, 471 U.S. at 3). However, "an officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable and the circumstances otherwise justify the use of such force." *Id.* In the context of an excessive force claim, the "reasonableness" inquiry is objective—"the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," in order to "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force" necessary in a given situation. *Id.* at 396–97.

Under *Graham*, courts consider "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others," and whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id.* at 396. In the Third Circuit, courts also consider "the physical injury to the plaintiff, the possibility that the persons subject to the police action [were] themselves violent or dangerous, the duration of the action, whether the action [took] place in the context of effecting an arrest, the possibility that the suspect may be armed, and the

number of persons with whom the police officers must contend at one time." *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

Here, there are several genuine issues of material fact which bear on whether Dorsey posed an immediate threat to Simpkins's and others' safety which preclude this Court from finding that Simpkins did not violate a constitutional right and is entitled to qualified immunity. *See Abraham*, 183 F.3d at 282, 290–91, 293–95 (reversing district court's grant of summary judgment because there were genuine disputes as to whether the suspect posed a significant threat of death or serious physical injury to members of the public and whether the police officer's shooting of the suspect was objectively reasonable in self-defense). In his Statement of Material Facts, Simpkins sets forth facts as to what occurred right before the incident with Dorsey unfolded. This Court considers not just the facts as alleged by Simpkins, but Plaintiffs' counter-factual statements, viewing the facts in the light most favorable to Plaintiffs. *See Carswell v. Borough of Homestead*, 381 F.3d 235, 243 (3d Cir. 2004) ("All of the events leading up to the pursuit of the suspect are relevant.").

Simpkins maintains that a reasonable officer in his position "would have reasonably believed that Decedent was an immediate threat and/or may have been involved in the active shootout occurring in the immediate vicinity." (Mov. Br. at 47.) Simpkins offers evidence, such as his own deposition testimony and that of other police officers on the scene or nearby that night, police radio calls, and a Shot Spotter report, to support his claim that there had been reports of shots fired in the area and that a large group of individuals had been spotted in the area of South 11th Street and Woodland Avenue. (*See, e.g.*, Def.'s SOMF ¶¶ 1 (Shot Spotter report), 9–11 (police radio calls), 15 (Reillo and Simpkins's deposition testimony).) According to Simpkins, this is what led the officers to continue up South 11th Street, where Detective Alvarado not only

heard shots being fired, but also saw two armed individuals—one "fleeing up South 11th Street toward its intersection with 10th Street," and another on the opposite side of the street who discharged his firearm. (Def.'s SOMF ¶¶ 19–20.) Whether there was an "active shootout" and whether Simpkins was "in the process of pursuing a gunman with his gun at the ready," (Mov. Br. at 21), are disputed factual allegations. Plaintiffs point to video evidence and Detective Reillo's deposition testimony that "there were only four to six people outside on/around the sidewalk of 11th Street," as well as the fact that "[o]nly one semiautomatic firearm and one fired bullet casing" were recovered from the area, apart from Simpkins's casing, to counter Simpkins's narrative of events. (*See, e.g.*, Pls.' SODMF ¶¶ 5–6 (no Shot Spotter report alert to gunshots at South 11th Street), 8 (admission from Simpkins that "it was common in Newark for people to shoot off fireworks and discharge firearms around midnight on New Years"), 16, 20, 22 (Reillo's deposition testimony).)

Genuine issues of material fact pertinent to the incident itself exist as well. For example, Simpkins alleges that Dorsey pushed him and his head directly into Dorsey's left arm with his right hand, (Def.'s SOMF ¶¶ 43–46), and his liability expert, Richard Celeste, Ph.D., opined that it was this contact that caused Simpkins to squeeze the trigger, (D.E. 228-15, Pls. Ex. 15 at 7:12–17, 8:5–9). Plaintiffs reject this characterization with their own experts. Expert Bill Munsel, Ph.D., P.E., "took high-speed video of the exact ammunition Simpkins was using to assess whether a muzzle flash would have been visible in the frame rate of the video of the shooting," and ultimately concluded "the probability of any one frame capturing any part of the muzzle flash [was] less than 1%." (Pls.' SODMF ¶ 44; D.E. 228-23, Pls. Ex. 23 at 4–5.) Plaintiffs' expert on bullet trajectory, Amy Santoro, Ph.D., explicitly contests Celeste's opinion, as she opines that "[t]he trajectory analysis along with the sworn testimony from Detective Simpkins" support the

conclusion that "the shot which struck and killed Carl Dorsey originated when Detective Simpkins extended his firearm towards Carl Dorsey." (D.E. 228-10, Pls. Ex 10 at 3–4.) It is also disputed whether Simpkins complied with the Newark Police Division's General Order setting forth the Plain Clothes Officer Recognition Policy.[10] Simpkins maintains that he yelled, "Police, police," but Plaintiffs point to Detective Reillo's deposition and post-shooting statements in which he stated he did not hear Simpkins or any other officer identify himself or give warnings prior to shooting. (*Compare* Def.'s SOMF ¶ 58, *with* Pls. SODMF ¶¶ 34–35.)

To be clear, the relevant inquiry here is "not whether [Simpkins] really was in danger as a matter of fact, but is instead whether it was objectively reasonable for [him] to believe that [he] was." *Abraham*, 183 F.3d at 294. Simpkins's testimony that he shot Dorsey because he believed he was in danger given the prior reports of a shootout may be credited as reasonable by a jury. However, at this stage, this Court will not "simply accept[] 'what may be a selfserving account by the officer[s] [involved].'" *Lamont*, 637 F.3d at 182 (first alteration in original) (quoting *Abraham*, 183 F.3d at 294); *see also Abraham*, 183 F.3d at 294 ("[S]ince the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'" (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

---

[10] The Plain Clothes Officer Recognition Policy, as set forth by Newark Police Division General Order 96-4, in relevant part, reads as follows:

> Every precaution must be taken by all members of the Division when undertaking police actions in plain clothes. They must operate on the premise that their identity as police officers is ***not known***. They must announce their identity as police officers and display the Color of the Day in a conspicuous manner such as on the head or gun arm/wrist. In addition, plain clothes personnel should display their police shield and if applicable, wear Division approved jackets with POLICE written on the front and back . . . Division members assigned to unmarked vehicles shall use lights and sirens at all times when responding, or initiating police actions.

(D.E. 228-17, Pls. Ex. 17 at 3.)

After carefully reviewing the surveillance video which captured the incident and considering the disputed material facts that exist in the record, this Court concludes that it is for a jury to weigh the evidence and determine whether Simpkins acted reasonably. For example, a jury should hear Simpkins's testimony and be able to determine whether it is credible and how much weight to give it vis-à-vis the surveillance video and other evidence. The ambiguity surrounding the events leading up to the incident and the rapid pace at which the events unfolded present several plausible interpretations of the facts and said interpretations bear directly on the reasonableness of the perceived threat. As such, a jury must resolve the question of whether Detective Simpkins violated Dorsey's Fourth Amendment rights.

**ii. Clear Establishment of the Right**

"Qualified immunity's second prong 'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. New Jersey State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Because the focus is on whether the officer has fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "[A] case directly on point" is not necessary for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Courts must define "clearly established law" with specificity, not at a high level of generality. *Id.* "[T]he general rules set forth in '*Garner* and *Graham* do not by themselves create clearly established law outside an obvious case.'" *Kisela*, 584 U.S. at 105 (quoting *White v. Pauly*,

580 U.S. 73, 80 (2017)). "[C]ourts have found obvious cases only in the absence of a serious threat of immediate harm to others." *Davenport v. Borough of Homestead*, 870 F.3d 273, 281 (3d Cir. 2017) (collecting cases). "[S]pecificity is especially important in the Fourth Amendment context," since "[i]t is sometimes difficult for an officer to determine how [a] relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix*, 577 U.S. at 12 (second alteration in original) (quoting *Saucier*, 533 U.S. at 205). "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 584 U.S. at 105 (quoting *Mullenix*, 577 U.S. at 18). *But see Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts.").

Defendant points to four cases to support his argument that there was no clearly established law that would have precluded him from using deadly force to defend himself against an individual who "while running from an active shooting scene" used sufficient force to knock Simpkins down. (Mov. Br. at 40.) Of those cases, this Court considers *Carswell* and *Kisela* only[11] and finds them inapposite.[12] Because courts "may consider all relevant cases under this inquiry, not just those

[11] The other two cases, *Richardson v. City of Newark*, No. 16-265, 2019 WL 2315013 (D.N.J. May 31, 2019) and *Easterling v. City of Newark*, 778 F. App'x 80 (3d Cir. 2019), lack precedential effect. *See El*, 975 F.3d at 340–41 ("[U]npublished cases, which are not binding, cannot establish a right."). Thus, this Court declines to consider them in its analysis.

[12] In *Carswell*, the Third Circuit held police officer Snyder made a reasonable mistake in using deadly force against a suspect who was running towards Snyder "with hands extended in front of him at shoulder height" and "palms pointed forward." 381 F.3d at 238. The suspect, Mr. Carswell, however, was known to police given his repeated violation of protection from abuse orders ("PFAs") obtained by his wife and had a felony warrant out for his arrest. *Id.* at 237–38. Mr. Carswell had visited his wife's home four times in the late hours of the preceding night into the early morning hours of November 18, 1999, which ultimately resulted in a police chase. *Id.* at 238. In concluding Snyder acted reasonably, the court noted the ongoing police

cited by the parties," *James*, 957 F.3d at 170, this Court surveys relevant Third Circuit precedent, as well as that of our sister circuits, to determine whether "the state of the law" in 2021 would have given a reasonable officer "fair warning" that shooting Dorsey was unconstitutional, *Hope*, 536 U.S. at 741, and answers that question in the affirmative.

In *Garner*, the Supreme Court held that Police Officer Elton Hymon's shooting of fleeing burglary suspect, Edward Garner, was unconstitutional because Hymon had "no articulable basis to think Garner was armed," particularly since he had not seen a sign of a weapon. 471 U.S. at 3, 20–21. Hymon had seen Garner run across a yard, called out, "police, halt," and shot at Garner once Garner began to climb over a fence at the edge of the yard. *Id.* at 3–4. The Court reasoned that "the fact that Garner was a suspected burglar could not, without regard to the other circumstances, automatically justify the use of deadly force," because Hymon lacked probable cause to believe Garner posed any physical danger to him or others. *Id.* at 21. *Garner* provides that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11.

---

chase, that Mr. Carswell "was running at full speed directly towards Snyder's cruiser," and Mr. Carswell's defiance to Snyder's repeated orders to stop. *Id.* at 243.

In *Kisela*, three police officers responded to a police radio report that "a woman was engaging in erratic behavior with a knife." 584 U.S. at 101. Shortly upon arriving on the scene, the officers spotted one woman, later identified as Sharon Chadwick, standing next to a car when another woman, later identified as Amy Hughes, emerged carrying a large knife at her side and stopped "no more than six feet" from Chadwick. *Id.* The officers told Hughes to drop the knife at least twice, and though she appeared calm, she "did not acknowledge the officers' presence or drop the knife." *Id.* at 101–02. Officer Kisela shot Hughes four times and he—along with the other officers—later testified that at the time of the shooting, they subjectively believed Hughes to be a threat to Chadwick. *Id.* at 102.

Both cases are factually inapposite as they involved the police receiving specific reports and/or information concerning a troubling individual and confrontations between law enforcement and the suspect with unheeded, repeated orders to stop. Here, there were no reports or information specific to Dorsey as a suspect and to the extent the collision between Dorsey and Simpkins could be considered a confrontation, there is no evidence suggesting there were unheeded and/or repeated orders to stop.

In *Lamont*, the Third Circuit applied *Garner* to hold that New Jersey State Troopers who followed a fleeing suspect by foot into dark and dense woods, opened fire after the suspect quickly "pulled his right hand out of his waistband" as if he were drawing a pistol, and continued firing at the suspect were not entitled to qualified immunity. 637 F.3d at 180, 185. The court reasoned that a jury could find the troopers "improperly continued firing after [the suspect] had turned away from them and no longer posed a threat." *Id.* at 184–85. Given that "the evidence would permit the conclusion that the troopers continued firing at [the suspect] after a reasonable officer would have realized that he did not pose a serious threat and stopped shooting," the court held that the right at issue was clearly established. *Id.* at 185.

In *El*, Lieutenant Kacsuta called for backup after stopping two unarmed men, Will and Beyshaud El, who she suspected had illegally purchased synthetic marijuana. 975 F.3d at 331–32. After other officers reported to the scene and began questioning the men, Will took "small steps" towards one of the officers and Kacsuta, which resulted in the officer slamming Will against a building and onto the pavement. *Id.* at 332. At the same time, Beyshaud was tased. *Id.* The Third Circuit concluded that precedent from sister circuits established a consensus that "an unarmed individual who is not suspected of a serious crime—including one who is verbally uncooperative or passively resists the police—has the right not to be subjected to physical force such as being grabbed, dragged, or taken down." *Id.* at 340.

Detective Simpkins's conduct was more egregious than that of the officers in *El* and more in line with the facts in *Garner* and *Lamont*. However, *El* is instructive as Will's steps towards Officer Warnock are comparable to Dorsey's movement of crossing the street and walking towards the unmarked Chevrolet Trailblazer. *Garner* and *Lamont* speak to the rapidly evolving scenario and the uncertainty as to whether a suspect—in this case Dorsey—was armed. Applying the

appropriate level of specificity here, this Court concludes that a reasonable officer had fair warning in January 2021 that using deadly force against an unarmed suspect who was moving toward the officer but was not holding a weapon and did not present an imminent threat of death or serious injury in a rapidly evolving situation, was unconstitutional.[13] As stated in *Abraham*: "A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect." 183 F.3d at 294.

In sum, Simpkins is not entitled to qualified immunity on Plaintiffs' excessive force and unreasonable seizure claims. Summary judgment on Counts I and II in each respective case is hereby denied.[14]

### B. Wagner's Remaining State Law Claims

#### i. Tort Claims (Counts IX to XII)

Wagner asserts the following tort claims: assault, battery, IIED, and NIED. Simpkins moves to dismiss Wagner's tort claims on multiple grounds, arguing the intentional tort claims should be dismissed because the discharge of his firearm was accidental and not willful. (Mov.

[13] This conclusion is supported by persuasive authority in the Court of Appeals. *See Banks v. Hawkins*, 999 F.3d 521, 529 (8th Cir. 2021) ("[W]e conclude that a reasonable officer had fair warning in February 2017 that he may not use deadly force against a suspect who did not present an imminent threat of death or serious injury, even if the officer felt attacked earlier and even if he believed the suspect had previously posed a threat."); *Est. of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 629 (9th Cir. 2022) ("Two cases published about three years before the April 2016 incident . . . made 'clear to a reasonable officer' that a police officer may not use deadly force against a non-threatening individual, even if the individual is armed, and even if the situation is volatile."); *Burke v. Pitts*, 157 F.4th 1326, 1348 (10th Cir. 2025) ("[I]t would be a clearly established Fourth Amendment violation for officer Pitts to corner and shoot a moving but unarmed and unthreatening suspect who was under the influence of drugs.").

[14] Summary judgment on Plaintiffs' NJCRA violation claims is similarly denied. *See Tucker v. City of Phila.*, 679 F. Supp. 3d 127, 137 (D.N.J. 2023) ("The analysis of claims under the NJCRA is identical to its federal counterpart: Section 1983."); *Black-Meadows v. Deptford Twp.*, No. 20-6951, 2026 WL 2453660, at *17 (D.N.J. Aug. 21, 2026) ("[T]he same genuine disputes of material fact that preclude summary judgment on Plaintiff's Section 1983 excessive-force claim also preclude summary judgment on Plaintiff's NJCRA claim."). Count VII in Fong's Second Amended Complaint and Count VI in Wagner's Second Amended Complaint may proceed.

Br. at 19–20.) Alternatively, Simpkins argues the doctrines of good faith immunity, the sudden emergency doctrine, and pursuit immunity under N.J. Stat. Ann. § 59:5-2(b)(1) through (3) and (c) apply and bar Wagner's tort claims. (*Id.* at 20–21, 43–44; D.E. 230 at 9.) As previously asserted, Wagner submits there are genuine issues of material fact as to whether Simpkins acted in an objectively reasonable manner, precluding summary judgment on the TCA claims. (Opp'n Br. at 37–39.)

The NJTCA immunizes public employees from liability for "any injury resulting from or caused by a law enforcement officer's pursuit of a person." N.J. Stat. Ann. § 59:5-2(c). It also immunizes a public employee who "acts in good faith in the execution or enforcement of any law." *Id.* § 59:3-3. The NJTCA strips a public employee of any immunity, however, if that employee is found to have engaged in "willful misconduct." *Id.* § 59:3-14(a).

The applicability of the good faith and sudden emergency immunity doctrines hinges on whether the public employee's conduct was reasonable. *See Castro v. New Jersey*, 521 F. Supp. 3d 509, 525 (D.N.J. 2021) ("[T]he same 'objective reasonableness' standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. 59:3-3."); *Roberts v. Hooper*, 438 A.2d 351, 353 (N.J. Super. Ct. App. Div. 1981) (explaining that the sudden emergency doctrine "negates negligence if the jury finds that the party chose one of alternative reasonably prudent courses of action, even though, by hindsight, another course of action would have been safer").

Here, the same factual disputes that preclude summary judgment on objective reasonableness in the Fourth Amendment context also preclude summary judgment on willful misconduct and the applicability of the asserted immunity doctrines. Thus, this Court cannot

determine as a matter of law whether the NJTCA and the sudden emergency doctrine shield Simpkins from liability. *See Castro*, 521 F. Supp. 3d at 525 (genuine issues of material fact precluded court from determining whether good faith immunity shielded defendants from liability on the plaintiff's tort claims); *Black-Meadows*, 2026 WL 2453660, at *17 ("[T]he same factual disputes that preclude summary judgment on objective reasonableness in the Fourth Amendment context also preclude summary judgment on willful misconduct, such that [defendant officer] is not entitled to NJTCA immunity as a matter of law.").

**ii. Claims Pursuant to the Survival Act and Wrongful Death Claim (Counts XIV & XV)**

Simpkins argues Wagner's wrongful death claim should be dismissed with prejudice under the law of the case doctrine because neither B.D. nor Wagner have standing.[15] (Mov. Br. at 18–19.) According to Simpkins, B.D. did not receive the type of support that would confer standing for such a claim and Wagner lacks standing because she and Decedent were never married. (*Id.* at 18–19.) Under intestacy rules, Wagner's wrongful death claims would be barred. (D.E. 230 at 11.)

Wagner argues B.D. is a statutory beneficiary to Decedent's estate and thus can recover under the Wrongful Death Act. (Opp'n Br. at 41.) Wagner submits her deposition supplies evidence of pecuniary loss, as it detailed Decedent's financial contributions. (Opp'n Br. at 41–42.) Lastly, Wagner argues her survival action is viable independent of whether her wrongful death claim remains. (Opp'n Br. at 43.)

[15] This Court previously dismissed Wagner's wrongful death claim after finding the Second Amended Complaint was "devoid of any indication as to whether B.D. was dependent on Mr. Dorsey for support at the time of Mr. Dorsey's death." *Wagner v. City of Newark*, No. 23-731, 2026 WL 229403, at *4 (D.N.J. Jan. 28, 2026).

The Survival Act permits an appointed representative of a decedent's estate to assert "any personal cause of action that decedent could have brought had he lived." *Aronberg v. Tolbert*, 25 A.3d 1121, 1124 (N.J. 2011); N.J.S.A. 2A:15-3(a)(1). "In other words, the survival action [merely] preserves 'the right of action which the deceased himself would have had[] to redress his own injuries.'" *Id.* (second alteration in original) (quoting *Alfone v. Sarno*, 432 A.2d 857, 862 (N.J. 1981)). "[A] Section 1983 cause of action will survive the complainant's death if it would do so under state law." *Endl v. New Jersey*, 5 F. Supp. 3d 689, 696 (D.N.J. 2014).

The Wrongful Death Act ("WDA"), in contrast, provides a decedent's heirs with "a right of recovery for pecuniary damages for their direct losses as a result of their relative's death due to the tortious conduct of another." *Aronberg*, 25 A.3d at 1125. The beneficiaries "must have been 'dependent on the decedent for support at the time of his death.'" *Id.* at 1125 n.4 (quoting *Newburg v. Arrigo*, 443 A.3d 1031, 1036 (N.J. 1982)); N.J. Stat. Ann. § 2A:31-4. "[S]ince the right to recover under the Wrongful Death Act is derived from the statutory laws of intestacy, which apply exclusively to 'surviving spouses,'" a decedent's unmarried cohabitating partner cannot recover for his or her individual claims. *See Sykes v. Propane Power Corp.*, 541 A.2d 271, 276–77 (N.J. Super. Ct. App. Div. 1988).

As co-administratrix *ad prosequendum* of Dorsey's estate, Wagner has standing to pursue the survival action on behalf of the estate. *See* N.J. Stat. Ann. § 2A:15-3(a)(1). Wagner lacks standing to pursue individual claims under the WDA, however. In her deposition testimony, she stated she and Dorsey did not live together. (D.E. 228-31, Pltfs. Ex. 31 at 5:2–5.) Wagner explained her total monthly expenses for her home, groceries, the cost of diapers, clothes, and formula was approximately $2,000 and that Dorsey contributed about $1,000 towards these costs. (*Id.* at 9:13–24.) It appears to this Court that Dorsey's contributions were for B.D. Wagner does

not point to any other evidence other than her own testimony to support her argument that there is a genuine issue of material fact as to whether Dorsey supported *her*. Even if she could make such a showing, *Sykes* suggests Wagner would still be unable to recover under the WDA given that she and Dorsey were unmarried and did not cohabit. Wagner has standing insofar as she is pursuing claims on behalf of B.D., who remains a proper party to this action as Dorsey's heir.

## V. CONCLUSION

For the reasons stated above, Defendant's Motion is **DENIED**. An appropriate order follows.

/s/ Susan D. Wigenton
**SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc: Parties
Alex D. Silagi, U.S.M.J.